**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**DARRYL WAYNE THOMPSON,**

     **Plaintiff,**

                               **Civil Action 2:20-cv-00705**
                               **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

**<u>OPINION AND ORDER</u>**

Plaintiff, Darryl Wayne Thompson, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits ("DIB") and supplemental social security income ("SSI"). Pending before the Court is Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 13), Plaintiff's reply (ECF No. 14), the administrative record (ECF No. 7). For the following reasons, the Court **AFFIRMS** the Commissioner's decision and **OVERRULES** Plaintiff's Statement of Errors.

**I.     BACKGROUND**

Plaintiff protectively filed an application for DBI on May 5, 2016, and an application for SSI on June 14, 2016. (R. at 267–72, 272–78.) Plaintiff alleged that he has been disabled since January 3, 2012 due to mental retardation, seizures, dementia, arthritis, hernia, anxiety, delusional disorder, intermittent explosive disorder, and ulcers. (R. at 267–72, 272–78, 80–81, 101–02.) Plaintiff's claims were denied initially on January 12, 2017 (R. at 80–100, 101–121) and upon reconsideration (R. at 124–45, 146–67.)

1

Plaintiff sought a *de novo* review before an Administrative Law Judge ("ALJ").  (R. at 185–190.)  The ALJ presided over a hearing on October 24, 2018, at which Plaintiff was represented by counsel, and issued a decision on January 31, 2019, finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 9–32.)  The AJL's determination became the final decision of the Commissioner when the Appeals Council denied review on December 31, 2019.  (R. at 1–6.)

Plaintiff seeks judicial review of that final determination.  He alleges that the ALJ erred in several ways.  First, Plaintiff generally contends that the ALJ improperly evaluated medical evidence.  Specifically, Plaintiff contends that the ALJ erred when determining that Plaintiff did not meet or medically equal a listed impairment; when analyzing opinion evidence; and by failing to develop the record.  (ECF No. 10, at PAGE ID #14–22.)  Second, Plaintiff alleges that the ALJ's determination that Plaintiff could successfully adjust to other work existing in substantial numbers in the national economy was not supported by substantial evidence.  (*Id.*, at PAGE ID #22–24.)  Plaintiff contends that the ALJ's determination lacked support because the relied on flawed testimony from a vocational expert ("VE").  The Commissioner contends that Plaintiff's allegations lack merit.

## II.     RELEVANT RECORD EVIDENCE

### A.     Plaintiff's Testimony

At the October 24, 2018, hearing, Plaintiff testified that he had not worked, including working "under the table," since 2012, when he was doing construction remodeling work. (R. at 39–40.)  Plaintiff further testified that he stopped working in 2012 because he sprained his ankle twice in one month, plus the work was hard and that was why he "quit messing with it."  (*Id.*)

Plaintiff indicated that he could not work at the time of the hearing because of issues he had with his whole right side since his stroke, including issues he had with his right shoulder, right wrist, "to [his] front to [his] belly button," and his right knee. (R. at 40–41.) He stated that he was lucky if he could stand two or three minutes. (R. at 41.) He also experienced weakness, daily lower back pain that was worsened by carrying items, tingling, and burning. (R. at 42–43.) He had difficulties walking up and down stairs, holding things with his left hand, reaching, and he experienced shortness of breath that was worsened by stair climbing. (R. at 43–45.) Plaintiff testified that he also experienced seizures of varying duration on a roughly monthly basis. (R. at 45–46.)

Plaintiff testified that he had been depressed for "too long;" he had irregular sleep and appetite; and he had difficulties concentrating. (R. at 47–48.) Specifically, Plaintiff agreed that he had trouble comprehending and following the plot in television shows. (R. at 48.) Although he did not have crying spells, he had mood swings all the time. (R. at 49.) When asked to describe a mood swing, he stated that an example was that he had beaten his brother up one time a couple years ago. (R. at 49.)

Plaintiff testified that he did not have typical days because his body had no routine. (R. at 49–50.) He would take trash out when he could, but it was difficult to do so. (R. at 50.) He did not cook or vacuum, and only sometimes accompanied his sister to the grocery store. (*Id*.) If he prepared food, he would have to take breaks and lie down on the couch. (R. at 52.) He could walk three or four houses before needing to rest. (*Id*.) He had trouble lifting a half gallon of orange juice and lifting a laundry basket almost "killed" him. (R. at 52, 53.) Plaintiff stated that he would talk with other people he knew but rarely left the house because he did not drive. (R. at 51.)

**B.      Relevant Medical Records**

1.      Physical Impairments— Treatment records

In August of 2015, Plaintiff sought treatment for a sprained ankle.  (R. at 574.)  X-rays revealed a fractured right heel bone, a split-type tear of the peroneus longus tendon, and tarsal navicular fracture.  (R. at 591, 590.)

Records dated November 3, 2015, indicate that Plaintiff sought treatment for pain at that time.  (R. at 1062.)  Plaintiff reported that his pain medication and stomach pills for GERD were not working.  (R. at 1063.)  Plaintiff further reported that he had a seizure disorder for years and that he had his most recent seizure the previous night.  (*Id.*)  He had previously taken neurontin.  (*Id.*)  Upon examination, Plaintiff exhibited tenderness, pain, and spasm in both shoulders but normal range of motion, pulse and strength, and had no bony tenderness, swelling, effusion, crepitus, deformity, or laceration.  (*Id.*)  Plaintiff was also alert and oriented, and had normal mood, affect, speech, behavior, judgment, and thought content.  (R. at 1064.)  Plaintiff was prescribed neurontin and cyclobenzine and was encouraged to quit smoking.  (R. at 1065.)

On November 9, 2015, Plaintiff had several X-Rays.  X-Rays of Plaintiff's left and right elbow and his right shoulder were normal.  (R. at 680, 747, 1091, 682, 749, 686, 1092, 753, 1089.)  But an X-Ray of Plaintiff's left shoulder showed subchondral cystic changes in Plaintiff's lateral humeral head.  (R. at 684, 751, 1090.)  In addition, a chest X-Ray revealed nonspecific perihilar peribronchiolar thickening.  (R. at 678, 745, 1088.)  Lung hyperinflation also suggested obstructive airways disease.  (*Id.*)

Later in November of 2015, Plaintiff sought treatment for nausea and vomiting.  A November 17, 2015, a CT scan of Plaintiff's chest revealed minimal atelectasis infiltrate in the

4

lower lobe of Plaintiff's left lung. (R. at 503, 1093.) A November 26, 2015, X-ray of Plaintiff's abdomen showed no evidence of acute pulmonary process. (R. at 502.) An emergency endoscopy that same day revealed, however, that Plaintiff had several large pieces of steak lodged in his esophagus. (*Id*.) The endoscopy also revealed distal esophageal narrowing at the GE junction. (R. at 498.) Plaintiff was prescribed Protonix and advised to return for another endoscopy with dilation and sedation. (*Id*.)

A spirometry test conducted on December 8, 2015, revealed that Plaintiff had a mild airway obstruction that did not improve with use of a bronchodilator. (R. at 539, 1192.)

In February of 2016, Plaintiff reported for a gastroenterological consultation. (R. at 598, 1095.) The records noted Plaintiff's history of food impaction and that he was scheduled for esophageal dilation. (*Id*.) Although Plaintiff was a poor historian and appeared to have a mental impairment, upon examination, he was alert and oriented, with no gross focal deficits and normal affect. (*Id*.) A colonoscopy was scheduled. (*Id*.)

Plaintiff followed up with his primary care provider on February 23, 2016. (R. at 1072.) At that visit, he was alert and oriented, and had normal mood, affect, speech, behavior, judgment, and thought content. (R. at 1074.) The notes indicate that Plaintiff smelled like alcohol and he admitted to drinking a few beers. (R. at 1075.) Plaintiff was educated about the risks of alcohol and encouraged to quit smoking. (*Id*.)

A March 25, 2016, colonoscopy found two small sigmoid polyps and small internal hemorrhoids. (R. at 600.) Plaintiff was advised to have another colonoscopy in five years. (*Id*.)

On April 4, 2016, Plaintiff sought treatment for pain, numbness, and tingling in his right hand with gripping and grasping activities. (R. at 993.) Plaintiff reported that he was "busy with construction" and that he had been advised to seek treatment because he experienced numbness

5

and tingling from work activities.  (*Id*.)  Plaintiff also reported that he had smoked about two packs of cigarettes a day for the last 35 years and that he consumed six cans of alcohol daily. (*Id*.)  Upon examination, Plaintiff was alert and oriented, pleasant and interactive, and had normal mood and affect.  (*Id*.)  Plaintiff's right hand was well calloused; he had a full range of motion in the fingers and thumb; he had full flexion and extension and radial and ulnar deviation in his wrist; a stable ulnar joint; and his pronation and supination were full and intact.  (R. at 995.)  In addition, Tinsel's, Phalen's, and compression tests were all negative.  (*Id*.)  Imaging revealed an old metacarpal fracture but with acceptable alignment and well maintained radiocarpal and intercarpal relationships with radial ulnar variance.  (*Id*.)  Mild cysts were, however, noted.  (*Id*.)  Notes from a follow up appointment on May 6, 2016, indicate that Plaintiff's EMG and NCV reports were normal.  (R. at 996, 692–96, 765–770.)  At that visit, Plaintiff was again alert and oriented, pleasant and interactive, and he had normal mood and affect.  (R. at 997.)  His grip strength was 5/5; his range of motion in his wrists and fingers was well preserved; and he had negative Tinsel's, Phalen's, and Watson shift test.  (*Id*.)  He did, however, have a little tenderness over the lunate and mild tenderness with palpitation around the wrist joint dorsally but with no specific or localizing signs.  (*Id*.)

On April 18, 2016, Plaintiff had an appointment with Dr. Branditz to follow up on the results of his November 17, 2015, CT chest scan that had showed patchy areas of infiltrate on the lower lobe of his left lung.  (R. at 642.)  Plaintiff had grossly normal strength and range of motion and he was alert, cooperative, and well oriented.  (R. at 643.)  At a second follow up appointment with Dr. Branditz on May 17, 2016, Plaintiff reported coughing and possible fever for the last few days, but he once again had grossly normal strength and range of motion and was alert, cooperative, and well oriented.  (R. at 648–49.)  Plaintiff also reported heavy beer

6

consumption and cigar smoking although he had smoked less recently while feeing unwell.  (R.at 648.)  A CT chest scan done that day revealed that the small area of infiltrate previously seen in Plaintiff's left lung had resolved and that there was a new area of infiltrate consistent with a low-grade pneumonia.  (R. at 649–50, 701–02, 755.)  A repeat CT chest scan done on November 7, 2016, confirmed resolution of the subtle infiltrate seen on Plaintiff's previous scans and that they had been likely related to infections.  (R. at 638, 723.)  The latest CT scan did, however, reveal early emphysematous findings.  (*Id*.)  Dr. Branditz examined Plaintiff on December 12, 2016, and again found that he had grossly normal strength and range of motion and was alert, cooperative, and well oriented.  (R. at 638.)  Dr. Branditz strongly advised Plaintiff to stop smoking.  (*Id*.)

On July 5, 2016, Plaintiff reported that he had a seizure that lasted about three seconds two nights prior to his office visit and his most recent seizure before that had occurred about one month prior.  (R. at 1080.)  A depression screen was negative.  (R. at 1081.)

A September 22, 2016, examination revealed that Plaintiff had normal mood, affect, speech, behavior, judgment, thought content, cognition, and memory.  (R. at 1019, 1048.)  A depression screen indicated no depression.  (R. at 1018, 1047.)  Plaintiff reported he had ceased smoking but that he was suffering poor sleep due to low back pain.  (*Id*.)  A September 27, 2016, X-Ray of Plaintiff's spine revealed osteopenia and mild degenerative facet changes but no acute osseous abnormality of the lumbar spine and no significant disc space narrowing.  (R. at 716, 758, 1031, 1057.)  Plaintiff's scores on an October 26, 2016, lumbar bone density approached mild osteopenia.  (R. at 1032, 1055, 1186.)

At an examination on October 24, 2016, Plaintiff was alert and oriented, and his behavior was normal.  (R. at 628.)  Blood tests revealed mild neutropenia.  (R. at 629.)  Plaintiff had

normal mood, affect, speech, behavior, judgment, thought content, cognition, and memory during a November 10, 2016, examination and a depression screen indicated no depression.  (R. at 1022, 1023, 1051, 1052.)  Plaintiff was prescribed oral vitamin b12.  (R. at 269.)  At an appointment on December 5, 2016, Plaintiff was alert and oriented, and his neutropenia had improved with vitamin replenishment.  (R. at 739–740.)

Plaintiff reported back and leg pain at an appointment on February 27, 2017.  (R. at 1025.)  Although Plaintiff had decreased range of motion, tenderness, and pain in his lumbar back, he had no bony tenderness, swelling, edema, deformity, laceration, or spasm.  (R. at 1026.)  Plaintiff also had normal mood, affect, speech, behavior, judgment, thought content, cognition, and memory.  (*Id.*)  Plaintiff was referred to a pain clinic. (R. at 1034.)

On March 27, 2017, imaging of Plaintiff's liver was done after tests revealed that he had elevated liver enzymes.  (R. at 1182.)  The imaging depicted that Plaintiff had increased echogenicity which could reflect fatty infiltration or hepatic steatosis.  (R. at 1182.)

Imaging studies done by a pain clinic on May 14, 2017, showed that Plaintiff had disc degeneration at L3-4 with some bulging, left annular tearing, and focal protrusion of the L4-5 disc into the left neural foramen which caused moderate stenosis. (R. at 1104.)

On September 26, 2017, Plaintiff sought treatment for staggering, dizziness, and tingling on his right side.  (R. at 1142.)  Examination findings were generally normal including that Plaintiff was alert and oriented and had normal affect and mood.  (R. at 1145.)  A CT scan revealed, however, that Plaintiff had old lacunar infarcts and that he had generalized cortical atrophy that was slightly advanced for his age group.  (R. at 1148, 1160.)

The following day, Plaintiff sought treatment from Rebecca Brauch, M.D.  (R. at 1259.)
Plaintiff reported his stroke, a history of being mildly "retarded," and having Alzheimer's.  (*Id*.)
Plaintiff was oriented and had appropriate mood and affect.  (R. at 1261.)

On October 26, 2017, Plaintiff sought treatment for his low back pain.  (R. at 1255.)  The
records reflect that Plaintiff had a known history of drug trafficking.  (*Id*.)  Upon examination,
alcohol odor was noted.  (R. at 1256.)  Plaintiff was, however, oriented and had appropriate
mood and affect.  (R. at 1257.)

Notes dated November 3, 2017, indicate that Plaintiff was referred to a pain management
specialist for low back pain.  (R. at 1206.)  Plaintiff reported a ten-year history of low back pain
that was exacerbated by prolonged sitting, standing, and walking.  (*Id*.)  He also reported that he
had been discharged from pain management elsewhere for noncompliance with pill counts. (*Id*.)
Upon examination, Plaintiff was awake, alert, and oriented.  (R. at 1208.)

On November 8, 2017, neurologist Brian Bjornstad, M.D.  ordered an EEG to investigate
Plaintiff's seizures.  (R. at 1212.)  Although the EEG was limited by high frequency artifact, it
showed no potentially epileptogenic abnormalities or electrographic seizure discharges during
rest, hyperventilation of photic stimulation, or drowsiness.  (*Id*.)  An MRI of Plaintiff's brain
done that same day showed mild parenchymal volume loss that was advanced for Plaintiff's age,
nonspecific periventricular and subcortical white matter changes, and paranasal sinus disease.
(R. at 1216.)

Dr. Brauch examined Plaintiff on January 11, 2018.  Plaintiff's answers to a depression
screen indicated moderately severe depression.  (R. at 1250.)  Plaintiff reported heavy tobacco
and alcohol use.  (R. at 1252–53.)  Plaintiff was oriented and had appropriate mood and affect.
(R. at 1253.)

An MRA of Plaintiff's neck on January 30, 2018, showed a complete left vertebral artery occlusion. (R. at 1220, 1224.) An echocardiogram dated March 14, 2018, indicated that Plaintiff had normal left and right ventricular size and systolic function, normal atria, trace tricuspid regurgitation, and no pericardial effusion. (R. at 1234.) Plaintiff's left ventricular ejection fraction was also between 60–65%. (*Id*.)

On March 5, 2018, Plaintiff treated with neurologist, Dr. Bjornstad. Plaintiff reported having a moderately severe seizure two months ago and another moderately severe seizure one month after that. (R. at 1433.) He reported falling off his couch during his most recent episode. (*Id*.) Dr. Bjornstad reviewed Plaintiff's prior studies. Dr, Bjornstad took note that no seizure activity had been noted on Plaintiff's November 8, 2017, EEG; there were no acute findings from Plaintiff's November 8, 2017, MRI of the head; but that a left arterial occlusion had been revealed in Plaintiff's January 30, 2018, MRA of the head and neck. (*Id*.) Dr. Bjornstad examined Plaintiff and found that he was fully alert and interactive although a family member had to provide some details of his history; he had no involuntary movements; normal language with no aphasia; his coordination and gait were intact; and he had no ataxia. (*Id*.) Dr. Bjorstad's impressions were recurrent seizures, lacunar infarctions associated with left vertebral occlusion; subjective memory impairment; hypersomnia; daily alcohol use with increased liver enzyme; and a history of stomach ulcer. (*Id*.)

At an office visit with Dr. Brauch on July 11, 2018, Plaintiff reported anxiety, pain, worsening headaches, and pain when standing. (R. at 1244.) He also reported continued heavy tobacco use and daily drinking. (R. 1246.) He was oriented and had appropriate mood and affect but had to leave before a neurological examination could be completed. (R. at 1246–47.)

On September 18, 2018, Plaintiff returned for a follow up visit with neurologist Dr. Bjornstad. Plaintiff reported increased seizure activity characterized by body jerking for one to two minutes and incontinence. (R. at 1490.) The episodes were moderately severe. (*Id*.) Once again, Plaintiff was fully alert and interactive; he had no involuntary movements; normal language with no aphasia; his coordination and gait were intact; and he had no ataxia. (*Id*.) Dr. Bjornstad reviewed with Plaintiff his test results including Plaintiff's March 14, 2018, echocardiogram and lab results. (*Id*.)

On October 2, 2018, Plaintiff saw Narcis Papadopol, M.D. to establish a treating relationship. (R. at 1367.) Plaintiff reported that he had started experiencing generalized tonic-clonic seizures approximately four years prior; he had one or two seizures a year; his seizures lasted about one minute; and his last seizure had occurred about three months ago. (R. at 1364.) Plaintiff related other medical history including his cerebral infarction, anxiety, heartburn, blood sugar issues, nicotine dependence, erectile disfunction, and sinus problems. (R. at 1364–66.) Dr. Papadopol's examination found that Plaintiff was alert and oriented, he had no cranial nerve deficit, and normal muscle tone and coordination. (R. at 1366.) Further, Plaintiff's mood, affect, behavior, and thought content were all normal. (*Id*.)

2.    Physical Impairment – Opinion Evidence

On December 30, 2016, state agency reviewer Rannie Amiri, M.D., reviewed Plaintiff's file at the initial level. Dr. Amiri opined that Plaintiff was limited to occasionally lifting 50 pounds and frequently lifting 25 pounds, and he could stand, walk, or sit for six hours out of an eight-hour workday. (R. at 93–95, 114–16.) Dr. Amiri also opined that Plaintiff could never climb ladders, ropes, or scaffolds, and could frequently stoop or crawl. (*Id*.) Further, Dr. Amiri opined that Plaintiff should avoid all exposure to hazards such as commercial driving, operating

11

dangerous machinery, unprotected heights. (*Id.*) On March 26, 2017, state agency reviewer Steve McKee, M.D., reviewed Plaintiff's file on reconsideration and opined the same limitations. (R. at 139–41, 161–63.)

On October 19, 2017, Dr. Brauch wrote a one paragraph letter stating that she had seen Plaintiff on September 27, 2017; he had suffered a recent cerebrovascular accident; and he could not work at the present time. (R. at 1100, 1105.)

### 3. Mental Impairment— Counseling records

Plaintiff participated in counseling at Cambridge Counseling from May of 2015, until March of 2018. Counseling records from that provider reflect that throughout this period, Plaintiff frequently received help with making doctor and other appointments (*see e.g.*, R. at 773, 781, 789, 793, 857, 867, 877, 885, 887, 895, 939, 941, 949, 955, 963, 1451, 1470); obtaining food pantry assistance (*see e.g.*, R. at 773, 779, 785, 791, 801, 803, 805, 859, 869, 875, 881, 887, 935, 939, 943, 951, 961, 971, 975, 979, 987, 1383, 1387, 1389, 1403, 1405, 1411, 1419, 1423, 1441); purchasing food (*see e.g.*, R. at 775, 799, 1395, 1476); SSI paperwork and issues (*see e.g.*, R. at 786, 807, 809, 893, 925, 965, 971, 981, 985, 1377, 1389, 1399, 1447, 1457, 1472, 1476, 1486); and living skills (*see e.g.*, R. at 775, 777, 779, 783, 787, 789, 795, 797, 799, 805, 809, 811, 813, 859, 863, 865, 871, 873, 875, 878, 879, 881, 893, 945, 953, 955, 957, 959, 961, 963, 967, 973, 975, 977, 979, 981, 983, 985, 1377, 1379, 1391, 1393, 1397, 1411, 1413, 1417, 1421, 1435, 1443, 1449, 1461, 1464, 1466, 1482).

Cambridge Counseling records also reflect that Plaintiff frequently reported engaging in work activities in 2015. On May 14, 2015, Plaintiff reported that he worked part-time "here and there." (R. at 907.) On June 6, 2015, Plaintiff reported working two days that week and that he hoped to have more work the following week. (R. at 856.) On June 25, 2015, he reported that

he would need to miss a day's work to attend a doctor appointment. (R. at 858.) On July 13, 2015, Plaintiff he reported that he hoped to get back to work that week so that he could purchase an ID card. (R. at 862.) On July 20, 2015, Plaintiff reported that he would be working the rest of that week. (R. at 864.) On July 30, 2015, Plaintiff reported that he had to work the rest of that week. (R. at 868.) On August 22, 2015, Plaintiff reported that he could have worked that week if he had not injured his ankle. (R. at 872.) On August 26, 2015, Plaintiff reported that he had been scheduled to work but was in jail after an altercation with his wife. (R. at 874.) On September 10, 2015, Plaintiff reported that he was going to try and work the rest of that week. (R. at 880.) On September 14, 2015, Plaintiff reported that he could have worked that week but he lacked clothing. (R. at 883.)

Cambridge Counseling records from 2016 reflect similar information. On January 11, 2016, Plaintiff reported that he hoped to get back to work soon. (R. at 924.) On February 8, 2016, Plaintiff reported that he had been working a few days that week. (R. at 930.) On February 15, 2016, Plaintiff reported that he was working a part-time job. (R. at 917.) On March 14, 2016, Plaintiff reported that he had not worked for the last few weeks. (R. at 938.) On April 11, 2016, Plaintiff reported that although he had hoped to work the prior week, he had not done so but that he might work a couple days that week. (R. at 946.) On May 9, 2016, Plaintiff reported contacting a friend about some part-time work. (R. at 954.) On May 16, 2016, Plaintiff reported that he hoped to have some part-time work that week. (R. at 956.) On May 23, 2016, Plaintiff reported that he planned to go back to work that week. (R. at 958.) On June 8, 2016, Plaintiff reported earning some cash mowing lawns over the weekend and hoping to mow more lawns the next day. (R. at 962.) On July 18, 2016, Plaintiff reported hoping to work a few odd jobs that week. (R. at 974.) On August 4, 2016, Plaintiff reported that he was making a few

13

dollars doing odd jobs in his neighborhood. (R. at 978.) On August 10, 2016, Plaintiff reported

that he had been unable to find work that week because of the hot weather. (R. at 980.) On

September 13, 2016, Plaintiff reported that he had not done much that past week and that he did

not think he would work until the spring because he did not work well in the winter. (R. at 988.)

On October 11, 2016, Plaintiff reported helping a friend and making a few dollars. (R. at 776.)

On November 1, 2016, he reported making some money over the weekend. (R. at 784.) On

November 28, 2016, he reported making $170 helping a friend patch a roof. (R. at 792.)

A handful of Cambridge Counseling records reflect that Plaintiff reported engaging in

work activity in 2017. On April 10, 2017, Plaintiff reported that he was going to try and work

some that summer if he could. (R. at 1392.) On May 17, 2017, Plaintiff reported that he did a

little work that week. (R. at 1402.)

The Cambridge Counseling records from also reflect that Plaintiff reported engaging in

other activities throughout the entire time that he treated there. On May 9, 2016, Plaintiff

reported that he had helped his roommate clean their apartment. (R. at 954.) On August 4, 2016,

Plaintiff reported that he had helped his brother's girlfriend move into her apartment. (R. at

978.) On October 18, 2016, Plaintiff reported that he was organizing his brother's items. (R. at

778.) On November 16, 2016, Plaintiff reported that he had helped his roommate clean their

apartment but that he was going to take it easy this winter. (R. at 788.) On November 21, 2016,

Plaintiff reported that he was using wood from a neighbor to make shelves for his CDs. (R. at

790.) On April 20, 2017, Plaintiff reported that his roommate had agreed to give him cigarettes

if he painted their apartment; he had already finished painting two rooms; and he was waiting for

more paint. (R. at 1394.) On April 26, 2017, Plaintiff showed his counselor the painting work

that he had completed. (R. at 1396.) On May 17, 2017, Plaintiff reported helping his girlfriend's

mother paint her apartment and that it took three days because his back and shoulders were aching. (R. at 1403.) On May 24, 2017, Plaintiff reported that he believed that his back pain had resulted from all that painting he had done recently. (R. at 1404.) On October 31, 2017, Plaintiff reported walking to Walmart with his roommate to buy food. (R. at 1446.) On January 9, 2018, Plaintiff reported that he helped his roommate move furniture over that weekend but noted that it had made his back and hip sore. (R. at 1465.)

Plaintiff also participated in counseling at Southeastern Ohio Counseling Center from March 27, 2018, until August 22, 2018. During his initial intake, Plaintiff reported a history of mild intellectual functioning, depression, and schizophrenia and that he had always "heard things and seen things." (R. at 1307.) At sessions thereafter, Plaintiff frequently reported being anxious (*see e.g.*, R. at 1312, 1313 1317 1319 1323 1357) or depressed (*see e.g.*, R. at 1315 1325 1327 1331 1351 1354 1355 1361 1362). The records also indicate that Plaintiff was almost always cooperative (*see e.g.*, 1312, 1313, 1315, 1317 1319 1321 1323 1325 1327 1329 1330 1331 1332 1333 1334 1352 1354 1362) and occasionally talkative (*see e.g.*, 1333, 1351, 1355, 1357, 1359, 1361).

### 4. Mental Impairment— Opinion Evidence

Plaintiff was consultatively examined on October 26, 2009, by George L. Horvat, Ph.D ("CE Horvat"). (R. at 472–74.) CE Horvat's mental status examination found that Plaintiff was alert, distractible, his concentration preoccupied, and his memory defective. (*Id*.) Plaintiff was oriented and cooperative, but his mood was depressed, his affect explosive, his speech flow pressured, and his thought content suspicious and delusional. (*Id*.) Plaintiff appeared to be of below average intelligence level. (*Id*.) CE Horvat wrote that Plaintiff had skill deficits in the areas of intellect, education, communication, interpersonal relationships, decision making, self

15

control, and responsibility. (R. at 474.) CE Horvat opined that Plaintiff was not capable of handling finances and that until his cognitive and memory functions could be established, it would be difficult to recommend a treatment program. (*Id.*)

Plaintiff was consultatively examined on October 4, 2016, by James N. Spindler, M.S. ("CE Spindler"). (R. at 614–21.) Upon examination, CE Spindler found that Plaintiff's gait seemed normal, he was appropriately dressed, and his grooming was average. (*Id.*) Plaintiff's speech was clear and he had normal rate and volume. (*Id.*) Although he sometimes answered vaguely, Plaintiff's comments were coherent and relevant. (*Id.*) Plaintiff had no apparent difficulty staying focused during the examination and his thought associations were adequate. (*Id.*) Plaintiff's mood was irritable and he appeared tired. (*Id.*) Plaintiff was alert and oriented to time and place, but he did not know, or he chose not to give, the exact date. (*Id.*) He appeared to be functioning in the borderline range of intelligence compared to others his age. (*Id.*) Nevertheless, Plaintiff's judgment seemed reliable for most routine matters. (*Id.*) CE Spindler also performed testing but wrote that Plaintiff was less than cooperative throughout the that portion of the evaluation and he clearly did not make an effort to do well. (*Id.*) That testing resulted in a score in the moderate range of intellectual disability but CE Spindler expressed doubt about the validity of Plaintiff's scores given Plaintiff's non-cooperation. (*Id.*)

CE Spindler opined that Plaintiff would likely have difficulties understanding and carrying out instructions in some job settings but that he seemed capable of managing a variety of unskilled, labor-type jobs. (*Id.*) CE Spindler also opined that it seemed questionable whether Plaintiff could sustain a working pace and maintain a level of attention and concentration that would be sufficient for most job settings. (*Id.*) CE Spindler opined that it seemed doubtful that Plaintiff had the ability to respond appropriately to supervisors and coworkers. (*Id.*) Last CE

16

Spindler opined that Plaintiff seemed unlikely to be able to respond appropriately to routine work pressures.  (*Id.*)

On October 20, 2016, state agency reviewer Kristen Haskins, Psy.D., reviewed Plaintiff's file at the initial level.  (R. at 96–98, 116–18.)  Dr. Haskins opined that Plaintiff was able to understand and recall simple one to four step instructions; perform short cycle tasks without strict pace and production demands; engage in superficial and infrequent contact with others; perform work in a routine environment where infrequent changes are explained in advance; and handle the stressors of work routines that do not involve timed tasks or rate quotas.  (*Id.*)  On March 23, 2017, state agency reviewer Irma Johnson, Psy.D., reviewed Plaintiff's file at reconsideration and opined the same limitations.  (R. at 141–43, 163–65.)

III.     **SUMMARY OF THE ADMINISTRATIVE DECISION**

On January 31, 2019, the ALJ issued his decision denying Plaintiff's application for

benefits.  (R. at 9–32.)  The ALJ found that Plaintiff met the insured status requirements of the

Social Security Act through June 30, 2014.  (R. at 15.)  At step one[1] of the sequential evaluation

process, the ALJ found that Plaintiff had not engaged in substantially gainful activity since the

alleged onset date of January 3, 2012.  (*Id.*)  At step two, the ALJ found that Plaintiff had the

following severe impairments: status post cerebra vascular accident, degenerative disc disease of

the lumbar spine, osteopenia, degenerative changes of the left shoulder, chronic obstructive

pulmonary disease (COPD), seizure disorder, carpal tunnel syndrome, anxiety, depression,

borderline intellectual functioning, and alcohol use disorder.  (*Id*.)  At step three, the ALJ found

that Plaintiff did not have an impairment or combination of impairments that met or medically

equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(R. at 16.)

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.     Is the claimant engaged in substantial gainful activity?
2.     Does the claimant suffer from one or more severe impairments?
3.     Do the claimant's severe impairments, alone or in combination, meet or
       equal the criteria of an impairment set forth in the Commissioner's Listing of
       Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.     Considering the claimant's residual functional capacity, can the claimant
       perform his or her past relevant work?
5.     Considering the claimant's age, education, past work experience, and residual
       functional capacity, can the claimant perform other work available in the national
       economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009);
*Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Before proceeding to step four, the ALJ set forth Plaintiff's RFC as follows:

After careful consideration of the entire record, [the ALJ] find[s] that the claimant has the residual functional capacity to: lift and/or carry 20 occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday and stand and/or walk for six hours in an eight-hour workday; no operation of foot controls; occasional climbing of ramps and stairs, but no climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, and crouching, but no crawling; no commercial driving; frequent forward, lateral, and overhead reaching with the left upper extremity; frequent handling and fingering with both upper extremities; no exposure to very loud noise as defined by the SCO code; no exposure to extreme bright lighting; must avoid concentrated exposure to pulmonary irritants such as fumes, odors, dusts, and gases; no exposure to hazardous machinery or unprotected heights; able to understand, remember, and carry out simple tasks; no fast-paced production; work as low stress defined as occasional decision-making and occasional changes in the work setting; and occasional interaction with coworkers and supervisors and no interaction with the public.

(R. at 18.)  When devising this RFC, the ALJ described and analyzed record evidence including medical opinion evidence from Dr. Brauch, CE Horvat, CE Spindler, Reviewer Haskins, and Reviewer Johnston.  (R. 19–24.)

At step four, the ALJ relied upon testimony from a vocational expert ("VE") to determine that Plaintiff was not capable of performing his past relevant work.  (R. at 24.)  At step five, the ALJ relied again on the VE's testimony and concluded that given Plaintiff's age, education, work experience, and RFC, he could perform other jobs that existed in significant numbers in the national economy such as a stock checker, routing clerk, and file clerk.  (R. at 24–25.)  Thus, the ALJ concluded that Plaintiff was not disabled under the Social Security Act. (R. at 26.)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## V.   ANALYSIS

Plaintiff alleges that the ALJ committed several reversible errors. The Court finds that none of Plaintiff's allegations of error have merit.

### A.   **ALJ Did Not Err in His Listing Analysis**

Plaintiff contends that the ALJ erred at step three. The Court disagrees.

At step three, a claimant will be found disabled if his impairment meets or medically equals one of the listings in the Listing of Impairments. 20 C.F.R. § 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x. 488, 491 (6th Cir. 2010). The Listing of Impairments, found in Appendix 1 to Subpart P of the regulations, describes impairments that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). A claimant must satisfy all the criteria to "meet" the listing. *See* 20 C.F.R. § 404.1525(c)(3) and (d); *Hale v. Sec'y of Health & Human Servs.,* 816 F.2d 1078, 1083 (6th Cir. 1984). A claimant is also deemed disabled if his impairment is the medical equivalent of a listing. 20 C.F.R. § 404.1520(a)(4)(iii); *Turner*, 381 F. Appx. at 491. Medical equivalence means "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a).

The ALJ determined that Plaintiff's mental impairments, singly or in combination, did not meet or medically equal Listings 12.04 and 12.06. The requirements for Listings 12.04 and 12.06 are set forth in paragraphs "A" "B" and "C" of each of those listings. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00A. To meet either of these listings, a claimant must satisfy the criteria in paragraphs A and B, or satisfy the criteria in paragraphs A and C. In this case, the ALJ determined that Plaintiff did not satisfy the criteria in paragraphs B or C. (R. at 16–18.)[2] In his Statement of Errors, Plaintiff asserts that the ALJ's paragraph B analysis was flawed.

---

[2] Plaintiff does not challenge the ALJ's paragraph C analysis. Consequently, any such challenge is waived. *Kuhn v. Washtenaw County*, 709 F.3d 612, 624 (6th Cir. 2013) (The Sixth Circuit "has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner are waived.") (internal citations omitted).

The paragraph B criteria for Listings 12.04 and 12.06 are the same: "1. *Understand, remember, or apply information (paragraph B1)*"; "2. *Interact with others (paragraph B2)*"; "*3. Concentrate, persist, or maintain pace (paragraph B3)*"; and "*4. Adapt or manage oneself (paragraph B4)*". 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00E1–4. These four areas of mental functioning are evaluated on a five-point rating scale: no limitation; mild limitation; moderate limitation; marked limitation; extreme limitation. 20 C.F.R. Pt. 404, Subpt. P, App. A 12.00F2a–e. To satisfy the paragraph B criteria for these listings, a claimant's mental disorder must result in extreme limitation in one, or marked limitation in two, of the four areas of mental functioning. *See* 20 C.F.R. Pt 404, Subpt. A, App. 1, 12.00F2, Listing 12.04 Depressive, bipolar and related disorders, Listing 12.06 Anxiety and obsessive-compulsive disorders.

Here, the ALJ stated, examined, and analyzed the four areas of mental functioning in paragraph B and concluded that Plaintiff had only moderate limitations in each of the four areas. (R. at 17–18.) Plaintiff alleges that the ALJ erred by writing the same analysis for each of the four areas and thereby failing to properly review each area separately. (ECF No. 10, at PAGE ID # 15, 17.)

Plaintiff is mistaken. At step three, the ALJ explained that Plaintiff had only moderate limitations in all four area for the following reasons: in 2016, Plaintiff reported that he was working in construction; a physical examination revealed that Plaintiff was in no acute distress and that he was alert and oriented; Plaintiff was vague and uncooperative during his consultative examination a few months later which resulted in invalid testing results; and Plaintiff repeatedly reported work activity during his counseling sessions. (R. at 17.) Although the ALJ cited these same reasons for finding only moderate impairments in all four areas, the ALJ did not stop there.

Instead, the ALJ also described other reasons why Plaintiff had only moderate limitations in *each* of the four areas.

First, when determining that Plaintiff only had moderate limitations in understanding, remembering, or applying information, the ALJ explained that a physical examination in September of 2016, revealed that Plaintiff had normal cognition and memory.  (R. at 17, citing R. 1019.)  In addition, the ALJ explained that even after Plaintiff's stroke in 2018, he was oriented with normal thought content when he was examined by one of his primary care providers.  (R. at 17, citing R. at 1366.)  The ALJ further explained that Plaintiff's neurologist, Dr. Bjornstad, found that Plaintiff was fully alert and interactive at an examination on October 2, 2018, and that Dr. Bjornstad wrote that no cognitive impairment was noted upon examination on September 18, 2018.  (R. at 17, citing R. at 1433, 1490.)

Second, when determining that Plaintiff had only moderate limitations in interacting with others, the ALJ explained that a physical examination in September of 2016, revealed that Plaintiff had normal mood, affect, speech, and behavior.  (R. at 17, citing R. 1019.)  In addition, the ALJ explained that even after Plaintiff's stroke in 2018, his mood, affect, and behavior were normal when he was examined by one of his primary care providers.  (R. at 17, citing R. at 1366.)  The ALJ further explained that examinations done by Plaintiff's neurologist, Dr. Bjornstad, on September 18, 2018, and October 2, 2018, resulted in no abnormal findings.  (R. at 17, citing R. at 1433, 1490.)

Next, when determining that Plaintiff had only moderate limitations with regard to concentrating, persisting, or maintaining pace, the ALJ explained that a physical examination in September of 2016, revealed that Plaintiff was alert and oriented.  (R. at 17, citing R. 1019.)  In addition, the ALJ explained that even after Plaintiff's stroke in 2018, he was alert and oriented

23

upon examination by one of his primary care providers. (R. at 17, citing R. at 1366.) The ALJ further explained that Plaintiff's neurologist, Dr. Bjornstad, examined Plaintiff on September 18, 2018, and October 2, 2018, and found that Plaintiff was fully alert and interactive with no voluntary movements or ataxia. (R. at 17, citing R. at 1433, 1490.)

Last, when determining that Plaintiff had only moderate limitations with regard to adapting or managing oneself, the ALJ explained that Plaintiff had normal judgment and thought content at a physical examination in September of 2016. (R. at 17, citing R. 1019.) In addition, the ALJ explained that even after Plaintiff's stroke in 2018, he was oriented and alert, and had normal behavior and thought content upon examination by one of his primary care providers. (R. at 18, citing R. at 1366.) The ALJ further explained that an examination by Plaintiff's neurologist, Dr. Bjornstad, on September 18, 2018, and October 2, 2018, resulted in no abnormal findings. (R. at 18, citing R. at 1433, 1490.)

In short, the ALJ separately considered each of the four areas of mental functioning. Although the ALJ gave some of the same reasons for concluding that Plaintiff had only moderate limitations in *all* four areas, the ALJ also gave different reasons for finding that Plaintiff's limitations were moderate in *each* area. Thus, there is nothing to suggest that the ALJ failed to separately evaluate the four areas of mental functioning.

Plaintiff also alleges that the ALJ erred because much of the evidence that he cited in his step-three analysis came from physical examinations rather than mental examinations. (ECF No. 10, at PAGE ID # 1537.) The governing regulations provide, however, that the Commissioner "will use *all* of the relevant medical and non-medical evidence in your case record to evaluate your mental disorder." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 12.00F(3)(a)) (emphasis

added).  It was, therefore, proper for the ALJ to consider such evidence, including evidence from

Plaintiff's treating neurologist.

Plaintiff alleges that the ALJ also erred at step three by failing to discuss certain

information in Plaintiff's counseling records— that Plaintiff reported hearing voices, needed to

be redirected, was forgetful, and received assistance with daily living skills— and was instead

"fixated" on the fact that Plaintiff worked in 2016 even though the administrative hearing took

place in 2018.  (ECF No. 10, at PAGE ID # 1538–39.)  The ALJ's determination, however, must

be read as a whole.  *Rogers*, 486 F.3d at 246.  Plaintiff treated with Cambridge Counseling for

almost three years.  The ALJ mentioned information from Plaintiff's 2016 counseling records

with this provider at step three and discussed counseling other records from this provider in

detail when assessing Plaintiff's RFC.  (R. at 17, 20, 21.)

Indeed, when assessing Plaintiff's RFC, the ALJ wrote:

The claimant participated with counseling and was noted cooperative throughout
in 2016 . . . .  The claimant reported not drinking alcohol for 3-4 days . . . . Although
the claimant denied working in 2016 at the hearing, he repeatedly discussed work
activity in 2016.  He noted working a few days a week . . . . The claimant reported
hoping to work a few days this week . . . . The claimant reported part time work
. . . . the claimant reported needing employment for rent  . . . . The claimant reported
hoping to work odd jobs over the weekend . . . . The claimant reported helping
someone move into a new apartment . . . . The claimant reported he could not find
any work because of the hot weather in August 2016 and hopes to find work soon
. . . . He reported in September 2016 that he did not think he would work again until
spring as he does not work well in the winter . . . .

(R. at 20.)

The claimant continued therapy in 2017 and into 2018 with the repeated note that
the claimant was cooperative . . . . In April 2017, the claimant reported he was going
to try to work some this summer . . . . The claimant painted two rooms for cigarettes
. . . . He reported being lazy the last few days and going for food assistance . . . . The
claimant noted his back pain is from all the painting he is doing . . . . The claimant

> admitted to taking his roommate's pain medication . . . . He reported helping his roommate move furniture over the weekend in 2018 . . . .

(R. at 21.) The ALJ also discussed evidence from Plaintiff's counseling sessions with Southeastern Ohio Counseling Center, with whom Plaintiff treated for only five months in 2018. The ALJ noted that "[t]he claimant continued therapy sessions in 2018 and reported he was good as long as he had his beer and cigars . . . ." (R. at 21–22.)

Plaintiff correctly notes that the ALJ referenced Plaintiff's work activities when discussing these counseling records. The Court finds, however, that this did not constitute reversible error. Plaintiff alleged that he became disabled on January 3, 2012. Plaintiff's ability to maintain part-time employment after that alleged date of onset was a permissible consideration. *Miller v. Comm'r Soc. Sec.*, 524 F. App'x. 191, 194 (6th Cir. 2013) ("[T]he ALJ did not err by considering [the claimant's] ability to maintain part-time employment as one factor relevant to the determination of whether he was disabled."); *see also* 20 C.F.R. § 404.1571 (the ability to perform work at less than substantial gainful activity level "may show that you are able to do more work than you actually did.")

Moreover, the Court finds unavailing Plaintiff's contention that the ALJ erred by failing to discuss certain information in Plaintiff's counseling records.[3] "'An ALJ need not discuss every piece of evidence in the record for [the ALJ's] decision to stand.'" *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 195–96 (6th Cir. 2020) (quoting *Thacker v. Comm'r*, 99 F. App'x.

---

[3] Plaintiff also alleges that "throughout his RFC analysis, the ALJ cited to an examination at 20F/40" but that "there is no examination on that page in the record." (ECF No. 10, at Page ID # 1539.) The Commissioner correctly notes that 20F/40 is the first page of a four-page treatment record from one of Plaintiff's primary providers, Dr. Gibson at Genesis Healthcare System. (R. at 1236–39.) Dr. Gibson's examination notes appear on the third page of that treatment record. (R. at 1238.)

26

661, 665 (6th Cir. May 21, 2004)); *see also Loral Def. Sys.-Akron v. NLRB*, 200 F.3d 436, 453

(6th Cir. 1999) ("An ALJ can consider all the evidence without directly addressing in his written

decision every piece of evidence submitted by a party.")  (citation omitted).  To the contrary,

"it is well settled that '[a]n ALJ can consider all the evidence without directly addressing in his

written decision every piece of evidence submitted by a party.'"  *Kornecky v. Comm'r of Soc.*

*Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006); *see also Thacker*, 99 F. App'x at 664

("The ALJ's failure to discuss [certain facts] does not indicate that they were not considered.").

In this case, the ALJ's analysis demonstrates that he reviewed the record evidence, including

Plaintiff's counseling records.  The ALJ was only required to consider that evidence— he was

not required to discuss every counseling record or every piece of information they contained.

Plaintiff also contends that the ALJ erred in the listing analysis because he considered

Plaintiff's impairments separately instead of analyzing their combined effects.  (ECF No. 10, at

PAGE ID # 1543.)  An ALJ is required to consider the combined effect of a claimant's

impairments when determining whether a claimant is disabled.  20 C.F.R. § 404.1523.

Nevertheless, an ALJ's individual discussion of multiple impairments does not mean that the

ALJ failed to consider the combined effect of those impairments where the ALJ specifically

referred to a "combination of impairments" when finding that a claimant does not meet the

listings.  *Loy v. Sec'y. of Health & Human Servs.*, 901 F. 2d 1306, 1313 (6th Cir. 1990) (citing

*Gooch v. Sec'y Health & Human Serv.*, 833 F.2d 589, 592 (6th Cir. 1987)).  Such is the case

here.  The ALJ discussed Plaintiff's multiple impairments individually but, at the third step, he

also specifically found that Plaintiff did not have "an impairment or combination of impairments

that meets or medically equals . . . the listed impairments in 20 CFR Part 404, Subpart P,

Appendix 1." (R. at 16.) In addition, the ALJ noted that his findings were made "[a]fter careful consideration of the entire record." (R. at 15.) Therefore, this argument also lacks merit.

Last, in his Reply, Plaintiff appears to allege, for the first time, that the ALJ erred at step three because he failed to consider if Plaintiff's impairments met or medically equaled Listing 12.02. (ECF No. 14, at PAGE ID # 1574.) It is well-established, however, that a party cannot raise new issues in a reply brief. *Bender v. Comm'r of Soc. Sec.*, No. 11–CV–1546, 2012 WL 3913094, at *8 (N.D. Ohio Aug. 17, 2012) (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008)); *Mauldin v. Comm'r of Soc. Sec.*, No. 1:17–cv–868, 2018 WL 6715730, at * 5 (S.D. Ohio Dec. 21, 2018), ("An issue cannot be raised for the first time in a reply memorandum."), *report and recommendation aff'd*, 2019 WL 187937 (S.D. Ohio Jan. 14, 2019); *Marrero v. Comm'r of Soc. Sec.*, No. 1:18–cv–198, 2019 WL 2521380, at *7 n. 5 (S.D. Ohio June 12, 2019), *report and recommendation aff'd*, ("plaintiff did not raise these issues in her Statement of Errors and may not raise new issues for the first time in her reply brief"), 2019 WL 4168971, (S.D. Ohio Sep. 3, 2019).

For all these reasons, the Court finds that the ALJ did not commit reversible error when performing his listing analysis.

### B.     The ALJ Did Not Err When Analyzing Medical Opinion Evidence

Plaintiff contends that the ALJ erred when analyzing and weighing medical opinion evidence including medical opinions from treating physician Dr. Brauch, CE Horvat, CE Spindler, and state agency reviewers Haskins and Johnson. The Court does not agree.

#### 1.     Treating Physician Dr. Brauch

An ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as

28

"statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

An ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . . "  20 C.F.R. § 416.927(c)(2); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to

29

any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x. 543, 550 (6th Cir. 2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).  The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.  *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x. 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(d).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Dr. Brauch authored a letter on October 17, 2017. It states: "[Plaintiff] is a patient of mine last seen on 9/27/2017, had a recent cerebrovascular accident and cannot work at the present time. Please do not hesitate to contact me with questions or concerns." (R. at 1100, 1105.) Plaintiff alleges that the ALJ erroneously disregarded this opinion because Dr. Brauch opined on the ultimate issue of disability and that this was not a valid reason to discount or ignore the opinion. (ECF No. 10, at PAGE ID # 1541.) Plaintiff further alleges that the ALJ failed to give good reasons for explaining the weight he assigned to this opinion. (*Id*., at PAGE ID # 1542–43.) These allegations lack merit.

The ALJ discussed Dr. Brauch's opinion as follows:

> The undersigned gives little weight to the opinions of the claimant's primary treating physician that the claimant "cannot work at the present time" . . . . This is a finding reserved for the Commissioner. Further, the opinion provides no function-by-function limitations and is not supported by normal neurological findings, generally normal physical examinations, and the claimant's activities of daily living. Specifically, the opinion is unsupported by physical examination findings that are unremarkable with normal examination of the extremities, no edema and an appropriate mood and affect . . . . The opinion is also inconsistent with neurological treatment notes that show intact gait, with no ataxia, no involuntary movement, normal speech, and no cognitive impairment . . . . Lastly, the claimant's activities of daily living included some work activity involving construction . . . .

(R. at 23.) This discussion makes it clear that the ALJ discounted Dr. Brauch's opinion because Dr. Brauch opined on the ultimate issue of disability. Contrary to Plaintiff's contention, however, that was a permissible consideration— an ALJ is not required to accept a physician's conclusion that her patient is unable to work because disability determinations are reserved to the Commissioner. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (stating that "[t]he determination of disability is ultimately the prerogative of the Commissioner, not the treating physician"). The ALJ was simply not obligated to give Dr. Brauch's opinion any special

significance. *Nash v. Comm'r of Soc. Sec.*, No. 19–6321, 2020 WL 6882255, at *5 (6th Cir. Aug 10, 2020) (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (finding ALJ appropriately gave no special significance to treating physicians' opinions regarding claimant's inability to work a regular full-time job)).

Regardless, the ALJ gave other good reasons for discounting Dr. Brauch's opinion. The ALJ discounted Dr. Brauch's opinion because it lacked a function-by-function analysis. *Smith v. Comm'r of Soc. Sec.*, No. 3:18CV622, 2019 WL 764792, at * 7 (N.D. Ohio Feb. 21, 2019) (finding that an ALJ reasonably determined that a treating physician's opinion was not well supported by the record evidence where, *inter alia*, "the doctor did not provide function-by-function analysis demonstrating the inability to perform any type of gainful activity.") In addition, the ALJ discounted Dr. Brauch's opinion because it was not supported by or consistent with other record evidence— supportability and consistency being two of the factors enumerated in 20 C.F.R. § 404.1527(c). Substantial evidence supports that determination. As the ALJ explained, Dr. Brauch's opinion was not supported by unremarkable physical examination findings including examinations that revealed normal examination of the extremities, no edema, and normal mood and affect. (R. at 23, 1253, 1261.) In addition, and as the ALJ explained, Dr. Brauch's opinion was inconsistent with neurological treatment notes showing intact gait, normal speech, and no ataxia, involuntary movements, or cognitive impairments. (R. at 23, 1366, 1433, 1490.)

The Court finds that the ALJ satisfied the good reasons requirement. Although an ALJ is required to consider all six factors listed in 20 C.F.R. § 404.1527(c), an ALJ is not required to set forth an "exhaustive factor-by-factor analysis" in his decision. The ALJ's determination addressed the fact that Dr. Brauch's opinion was directed at an issue reserved to the

Commissioner, the opinion lacked a function-by-function analysis, and the opinion was not supported by or consistent with other record evidence. In short, the ALJ's explanation was sufficiently specific to make clear the weight that he assigned Dr. Brauch's opinion and the reasons for that weight. *See McCoy v. Comm'r of Soc. Sec.*, 356 F. Supp. 3d 704, 711 (S.D. Ohio Nov. 29, 2018) (concluding that an ALJ satisfied the good reason requirement where he explained that the treating physician's opinion "lacked a function-by-function analysis and failed the supportablity and consistency factors enumerated in 20 C.F.R § 404.1527(c)). For all these reasons, the Court finds that the ALJ did not commit reversible error when considering Dr. Brauch's opinion.

### 2.    CE Horvat and CE Spindler

Plaintiff contends that the ALJ improperly evaluated the opinions from CE Horvat and CE Spindler. Although an ALJ must consider the opinion from consultative examiners, an ALJ need not assess such opinions for controlling weight. *Gayheart*, 710 F. 3d at 376. "The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion." *Id*. (internal citations omitted)

Plaintiff alleges that the ALJ erred when considering CE Horvat's because the "only reason proffered by the ALJ for disregarding this opinion is that the examination occurred prior to the alleged onset date." (ECF No. 10, at PAGE ID # 1542.) This claim lacks merit.

The Sixth Circuit "'does not endorse the position that all evidence or medical records predating the alleged date of onset of disability . . . are necessarily irrelevant or automatically barred from consideration.'" *O'Malley v. Comm'r. of Soc. Sec.*, 210 F. Supp. 3d 909, 915 (S.D.

33

Ohio 2016) (quoting *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 416 (6th Cir. 2006)).

In this case, however, the ALJ did not discount CE Horvat's opinion solely because it predated

the alleged onset date.  The ALJ discussed CE Horvat's opinion as follows:

> The undersigned gives little weight to a remote evaluation in 2009 where the psychologist opined that the claimant is unable to handle finances until cognition and memory could be established . . . .  The opinion is stale as it was rendered in 2009, well before the alleged onset date in 2012.  Moreover, the opinion is inconsistent with evaluation findings and mental status findings from the current record . . . .

(R. at 24.)  It is clear from this discussion that the ALJ not only discounted CE Horvat's opinion

because it was "stale," the ALJ also discounted it because it was inconsistent with evaluation

findings and mental status findings from the current record.  (R. at 24.)  Consistency is one of the

factors enumerated in 20 C.F.R. § 404.1527(c).  Moreover, substantial evidence supports that

determination.  CE Horvath's opinion that Plaintiff could not handle finances until memory and

cognition are inconsistent with other record evidence including CE Spindler's examination

finding that Plaintiff appeared to be functioning in the borderline range of intelligence (R. at

614–23), examinations finding that Plaintiff had normal cognition and memory (R. at R. at 1019,

1022, 1026), and a March 5, 2018, examination by Plaintiff's treating neurologist during which

no cognitive impairment was noted (R.at 1433).

Plaintiff also alleges that the ALJ erred when considering CE Spindler's opinion.  The

ALJ discussed CE Spindler's opinion as follows:

> The undersigned gives little weight to the opinion of consultative mental examiner who opined that the claimant would have questionable abilities with respect to maintaining attention, concentration and pace, difficulty responding to others in the work place and would be unlikely to respond to routine work stressors . . . .  The opinion deserves little weight since the claimant was less than cooperative and failed to give full effort during the evaluation, which renders any reliance on the claimant's subjective reports to be dubious at best.  Moreover, the opinion is

34

> inconsistent with his own mental status evaluation that showed normal speech and
> no difficulty staying focused.  The consultative examiner's opinion with respect to
> the claimant's cognition function is unreliable since the claimant's IQ of 47 was
> invalid and he gave less than full effort.  Moreover, repeated mental status
> examinations by the claimant's treating neurologist showed normal speech and
> intact cognition . . . .  Lastly, there is also evidence of non-compliance as alcohol
> use is noted throughout the record and claimant was discharged from a pain
> management practice due to an inappropriate pill count . . . .

(R. at 23–24.)  Plaintiff alleges that the ALJ erred by discounting CE Spindler's opinion while

simultaneously relying on CE Spindler's examination findings.  (ECF No. 10, at PAGE ID #

1539.)  Specifically, Plaintiff alleges that it was error for the ALJ to discount CE Spindler's

opinion but credit CE Spindler's examination findings that Plaintiff was not cooperative and

failed to give full efforts during his examination.  CE Spindler's opinion is distinguishable,

however, from CE Spindler's examination findings.  Moreover, it was proper for the ALJ to

consider CE Spindler's examination findings given that the ALJ is tasked with considering all

the evidence of record.  *See* 20 C.F.R. § 404.1545(a)(1) (an ALJ must "assess [a claimant's RFC]

based on all relevant evidence in [the claimant's] case record.")

     For these reasons, the Court finds that the ALJ did not commit reversible error when

considering the opinions from CE Horvat and CE Spindler.

### 3.     State Agency Reviewers Haskins and Johnson

      Plaintiff alleges that the ALJ erred when considering the opinions from state agency

reviewers Drs. Haskins and Johnson.  "[T]he opinions of non-examining state agency medical

consultants have some value and can, under some circumstances, be given significant

weight."  *Douglas v. Comm'r of Soc. Sec.,* 832 F.Supp. 2d 813, 823–24 (S.D. Ohio 2011).  This

is because the Commissioner views such medical sources "as highly qualified physicians and

psychologists who are experts in the evaluation of the medical issues in disability claims under

the [Social Security] Act." *Id.;* 20 C.F.R § 416.927(d),(f). "Consequently, opinions of . . . record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization." *Douglas,* 832 F.Supp. 2d at 823–24.

In this case, the ALJ gave significant weight to the opinions from Drs. Haskins and Johnson because they were consistent with other record evidence including CE Spindler's examination findings.  (R. at 23.)  Plaintiff alleges that this was error because the ALJ discredited CE Spindler's opinion.  (ECF No. 10, at PAGE ID # 1540–41.)  As discussed previously, however, CE Spindler's opinion is distinguishable from CE Spindler's examination findings and the ALJ could discount the former while relying on the latter.

Plaintiff also contends that the ALJ erred by giving the opinions from Drs. Haskins and Johnson great weight but then failing to incorporate certain limitations that they opined.  (ECF No. 10, at PAGE ID # 1541.)  However, "there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given significant weight." *Price v. Comm'r of Soc. Sec.*, 2:18–cv–128, 2019 WL 396415, at *2 (S.D. Ohio Jan. 31, 2019) (quoting *Smith v. Comm'r of Soc. Sec.*, No. 5:11–cv–2104, 2013 WL 1150133, at *11 (N.D. Ohio March 19, 2103)).

In any event, the Commissioner correctly points out that Drs. Haskins and Johnson's official opinions were contained in narrative sections following categories of limitations on the forms that they used and in the "Additional Explanation" sections of those forms.  (R. at 96, 163.)  The limitations that Plaintiff alleges are missing from the RFC assessed by the ALJ and are not found, however, in either of those sections.  Indeed, the form makes it clear that that the limitations identified by Plaintiff are not part of the official opinions from Drs. Haskins and Johnson. *See Shepard v. Colvin*, No. 3:12CV00149, 2013 WL 2179366, at *12–13 (S.D. Ohio

36

May 20, 2013), ("Section I of the form is merely a worksheet for the evaluator and does not constitute the evaluator's residual functional capacity."), *report and recommendation aff'd*, No. 3:12-CV-149, 2013 WL 3053533 (S.D. Ohio June 17, 2013).  When the official opinions from Drs. Haskins and Johnson are compared to the ALJ's RFC determination, it is clear that the ALJ incorporated their official opinions into Plaintiff's RFC.  (R. at 96-97, 163-65, 18.)

For these reasons, the Court does not find that the ALJ committed reversible error when considering the medical opinions from Drs. Haskins and Johnson.

### C.    The ALJ Did Not Abuse His Discretion By Denying Plaintiff's Request for a Supplemental Examination

Plaintiff alleges that the ALJ erred when he denied his request for an additional consultative examination to determine Plaintiff's mental functioning after his stroke in 2017. (ECF No. 10, at PAGE ID # 1540.)  An ALJ has a "duty to develop the record," *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 262 (6th Cir. 2015), but he also "has the discretion to determine whether additional evidence is necessary."  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (citing *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001)).  When the record evidence is insufficient to support a disability determination, an ALJ may recontact medial sources, request additional existing medical records, ask the claimant to undergo a consultative examination, or ask the claimant for more information.  20 C.F.R. § 416.920b(c)(i)–(iv).  But the regulations do not require an ALJ to seek out additional evidence where the record evidence is already sufficient.  *Foster*, 279 F. 3d at 355–56 (*citing Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination.")

In this case, the ALJ denied Plaintiff's request because the record contained relevant evidence that post-dated Plaintiff's 2017 stroke.  (R. at 12–13.)  The Court finds that this did not constitute an abuse of discretion.  The record contains notes from 2018 from Plaintiff's treating neurologist, Dr, Bjornstad, indicating that Plaintiff's examinations were generally normal and that Plaintiff had no cognitive impairment.  (R. at 1433, 1490.)  The record also contains diagnostic tests, including an MRI of Plaintiff's brain and an MRA of Plaintiff's head and neck, that were done after Plaintiff's stroke, and Dr. Bjornstad's discussion of those tests.  (R. at 1212, 1216, 1433.)  In addition, an examination by one of Plaintiff's primary providers in October of 2018 revealed that Plaintiff was alert and oriented, with normal mood, affect, behavior, and thought content. (R. at 1366.)  Accordingly, the ALJ did not abuse his discretion by finding that the record contained sufficient evidence in the record to evaluate Plaintiff's impairments after the 2017 stroke.

### D. The ALJ Did Not Err When Relying on the VE's Testimony

At step five, the ALJ relied on testimony from the VE to determine that based on Plaintiff's age, education, work experience, and RFC, Plaintiff was able to perform other work that existed in significant number in the national economy.  (R. at 24–26.)  Plaintiff alleges that the VE's testimony was flawed in two ways and thus it does not constitute substantial support for the ALJ's determination.

First, Plaintiff that notes that although the ALJ found that Plaintiff had only a limited education, the VE testified that Plaintiff could perform work that required more advanced reasoning abilities.  (R. at 24.)  Specifically, the VE testified, and the ALJ determined, that Plaintiff was able to perform the requirements for stock checker, routing clerk, and file clerk.  (R. at 24).  Plaintiff argues that these three jobs require a reasoning level of two, and thus they are

inconsistent with the ALJ's determination that Plaintiff had a limited education. (ECF No. 10, at PAGE ID # 1545.) All three of these jobs, however, correspond to a specific vocational preparation value ("SVP") of 2, which corresponds to "unskilled" work.[4] *See* Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions, SSR 00-4p, 2000 WL 1898704, at *3 (S.S.A. 2000) (the definition of unskilled work at 20 C.F.R. § 404.1568(a) corresponds to an SVP of one to two). The regulations provide that an individual with a "limited education" has the abilities in "reasoning, arithmetic, and language skills" adequate to perform jobs less demanding than "most of the more complex job duties needed in semi-skilled or skilled jobs." (20 C.F.R. § 404.1564(b)(3)). Thus, the regulations do not indicate that Plaintiff's limited education was inconsistent with unskilled work, including these three jobs.

Relatedly, Plaintiff argues that because these three jobs have a reasoning level of 2, they were inconsistent with the ALJ's determination that Plaintiff's borderline intellectual functioning was a severe impairment. (ECF No.10, at PAGE ID # 1545.) Despite that step-two determination, however, when assessing Plaintiff's RFC, the ALJ determined that Plaintiff was able to understand, remember, and carry out simple tasks. (R. at 18.) The Sixth Circuit has held that an ALJ did not err when finding that a claimant who was limited to simple work could perform jobs with a reasoning level of 2 or 3. *Monateri v. Comm'r of Soc. Sec*., 436 F. App'x. 434, 436 (6th Cir. 2011) ("[Plaintiff] cites no authority for the proposition that jobs requiring reasoning levels of two or three are inconsistent as a matter of law with a limitation to simple

---

[4] Unskilled work is defined by regulation as work that requires little or no judgment to do simple jobs that can be learned on the job in a short period. *See* 20 C.F.R. §404.1568(a).

work.")  In short, Plaintiff points to no authority that suggests that Plaintiff's education level or limitation to simple work was inconsistent with the three jobs identified by the VE.

Next, Plaintiff challenges the VE's testimony, and the ALJ's conclusion, that these three jobs existed in sufficient numbers in the national economy.  (ECF No.10, at PAGE ID # 1545–46.)  The VE testified that there were 155,000 stock checker jobs, 286,000 routing clerk jobs, and 153,000 file clerk jobs in the national economy.  (R. at 58.)  Plaintiff argues that he submitted evidence from another VE that there are actually far fewer stock checker jobs in the national economy and that the ALJ erred by summarily dismissing that contrary VE evidence. The ALJ did not, however, summarily dismiss that contrary evidence.  (R. at 450.)  Instead, the ALJ explained that even if he were to find that there were fewer stock checker jobs, the VE testified that there were 439,000 jobs in the national economy (286,000 routing clerk jobs and 153,000 file clerk jobs) and Plaintiff did not challenge that assessment.  (R. at 25.)  Thus, the ALJ concluded significant numbers of other work existed in the national economy even if the stock checker job was eliminated.  The Court does not find that the ALJ erred in reaching that conclusion.

For these reasons, the Court finds that the ALJ did not err by relying on the VE's testimony, and that testimony constituted substantial support for the ALJ's step-five analysis.

## VI.  CONCLUSION

For all the foregoing reasons, the Court finds that substantial evidence supports the ALJ's decision.  The Court therefore **AFFIRMS** the Commissioner's decision and **OVERRULES** Plaintiff's Statement of Errors.  The Clerk is **DIRECTED** to enter judgment in favor of Defendant.

40

**IT IS SO ORDERED.**

**Date:**   February 10, 2021                    /s/   *Elizabeth A. Preston Deavers*_____
                                                      **ELIZABETH A. PRESTON DEAVERS**
                                                      **UNITED STATES MAGISTRATE JUDGE**